UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | Cr. No.:  **1:26-cr-5-JJM-PAS** |
| v. | Violations: |
| THOMAS SANDGAARD, | 18 U.S.C. § 1349 (Conspiracy to Commit Mail Fraud, Health Care Fraud and Securities Fraud) |
| and | 18 U.S.C. § 1341 (Mail Fraud) |
| ANNA LUCSOK, | 18 U.S.C. § 1347 (Health Care Fraud) |
| Defendants. | 18 U.S.C. § 2 (Aiding and Abetting) |
| | 18 U.S.C. § 1028A (Aggravated Identity Theft) |

## INDICTMENT

The Grand Jury charges that:

At all times relevant to this Indictment, unless otherwise indicated:

### DEFENDANTS AND RELEVANT ENTITIES

1.     Defendant THOMAS SANDGAARD (SANDGAARD) was the founder and the Chief Executive Officer of the medical device company Zynex Inc. and its subsidiary, Zynex Medical (together "Zynex"), since Zynex's inception in 1996 until on or about August 18, 2025. He served as the Chairman of the Board at the time of this Indictment.

2.     Defendant ANNA LUCSOK (LUCSOK) was the Chief Operating Officer and/or billing director of Zynex from in or about January 2021 until in or about September 2025.

LUCSOK joined Zynex in February 2018 and served as the Vice President of Reimbursement from in or about October 2019 until about January 2021.

3.    Zynex was a Colorado corporation with a principal place of business in Englewood, Colorado. Zynex was a nationwide supplier of the NexWave, an electrotherapy device, and other electrotherapy devices for use in pain management and physical rehabilitation. Zynex was publicly traded and has been listed on the NASDAQ stock exchange under the ticker symbol "ZYXI" since in or about February 2019. During the relevant time-period, Zynex's electrotherapy devices and related supplies accounted for approximately more than 90% of Zynex's revenues.

## OVERVIEW

4.    Beginning in or about at least 2017 and continuing until in or about late 2025, SANDGAARD and LUCSOK (together "DEFENDANTS"), orchestrated a fraud scheme to obtain millions of dollars by fraud from government and private health care payors and patients, as well as to defraud investors in Zynex by concealing that the company's billings and revenues were driven by fraud.

5.    As part of this scheme, SANDGAARD and LUCSOK caused Zynex to routinely ship excessive and unnecessary medical supplies to patients and to submit millions of dollars in false and fraudulent claims and billings to health care payors and patients for medical devices and supplies that were not medically necessary and not covered by these insurance programs and not agreed to by the patients.

6.    SANDGAARD and LUCSOK continued these fraudulent and illegal practices despite being notified many times that their billing practices were improper and fraudulent.

7.    In total, between in or about 2017 and late 2025, SANDGAARD and

2

LUCSOK caused Zynex to collect more than $873 million for its products, of which more than $600 million was for supplies, and more than $273 million was for devices. The vast majority of the supplies billings were for unnecessary and improperly billed supplies.

8.    SANDGAARD and LUCSOK caused the fraudulent billing of devices, and excessive shipments and billing of supplies, including electrodes and batteries commercially available at much lower prices, to be billed at more than a hundred dollars per set, in order to inflate the revenues and profits they were reporting to the market for Zynex. According to Zynex's United States Securities and Exchange Commission (SEC) filings, the supplies billings accounted for approximately 70% of Zynex's revenues each year.

9.    SANDGAARD and LUCSOK used these fraudulent billings, and the revenues derived therefrom, to fraudulently inflate the company's financial reporting and drive up the stock price of Zynex. As part of this scheme, SANDGAARD and LUCSOK caused Zynex to issue false and misleading statements about its financial performance, operational practices, risks, and compliance with insurers' reimbursement policies and concealed the ongoing material fraud upon patients and insurers. These statements concealed, among other things, the systemic "oversupplying scheme" whereby DEFENDANTS caused Zynex to ship excessive quantities of supplies, such as electrode pads and batteries, to patients, and billed insurers for hundreds of millions of dollars more than was permitted or medically necessary.

10.    The purpose of SANDGAARD and LUCSOK's fraud schemes was to personally enrich themselves in the form of large salaries and bonuses, stock, stock options and payments for stock repurchases, among other ways. DEFENDANTS used the funds transferred to themselves from the proceeds of these frauds to benefit themselves and others.

They engaged in transactions involving fraud proceeds exceeding $10,000 to pay for, among other things, a private jet, a Lamborghini, a McLaren Model 72S Spider, cosmetic procedures, real estate and a European soccer team.

## BACKGROUND

### The Medicare Program

11.     The Medicare program (Medicare) was a federal health insurance program providing benefits to persons 65 or older, as well, as persons under age 65 who are disabled. The United States Department of Health and Human Services (HHS), through the Centers for Medicare and Medicaid Services (CMS), administered Medicare.

12.     To receive Medicare reimbursement, providers had to apply and execute a written provider agreement. The Medicare provider enrollment application, CMS Form 855, required an authorized representative of the provider to sign and certify that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [the provider]. The Medicare laws, regulations, and program instructions are available through the [MAC]. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions….

13.     CMS Form 855 contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," and "will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

14.     Zynex has been enrolled in Medicare since approximately March 1999.

15.     Medicare paid for items and services only if they were medically reasonable and necessary, eligible for reimbursement, and provided as represented.

4

### Medicare Part B

16.     Medicare includes an insurance benefit known as "Part B," which covered, among other things, durable medical equipment (DME) that was medically necessary and ordered by licensed medical doctors or other qualified health care providers. To administer Part B, CMS acted through fiscal agents called Medicare Administrative Contractors (MACs), which were statutory agents for CMS for Medicare Part B.

### Medicare Part C - Medicare Advantage

17.     CMS has the authority to award contracts to private entities to administer the Medicare program through Medicare Advantage Plans, or Medicare Part C, which follow the same rules and regulations as traditional Medicare plans. CMS pays a fixed amount to the private companies that offer and administer the Medicare Advantage Plans. Private health insurance companies offering Medicare Advantage Plans were required to provide beneficiaries with the same items and services offered under Medicare Part A and Part B, including DME.

18.     To obtain payment for items and services supplied and provided to beneficiaries enrolled in Medicare Advantage Plans, providers were required to submit itemized claim forms, usually electronically, to the beneficiary's Medicare Advantage Plan. When providers submitted claim forms to Medicare Advantage Plans, the providers certified that the contents of the forms were true, correct, and complete, and that the forms were prepared in compliance with the laws and regulations governing Medicare. Providers also certified that the items and services being billed were medically necessary and were in fact provided as billed.

19.     A claim for DME submitted to Medicare or Medicare Advantage plans qualified for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and ordered by a licensed physician or other qualified health care provider. Local

5

Coverage Determinations (LCDs) are issued and published by MACs to provide clarification or additional coverage criteria for certain services and products, including DME, to providers within those geographical areas. The LCD entitled Local Coverage Determination "Transcutaneous Electrical Nerve Stimulators (TENS)" L33802, was effective for services performed after 10/1/2015 and states:

> For any item to be covered by Medicare, it must 1) be eligible for a defined Medicare benefit category, 2) be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and 3) meet all other applicable Medicare statutory and regulatory requirements.

https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33802. This LCD was effective for all MAC jurisdictions, i.e., nationwide.

### Medicaid

20.     The Medicaid program (Medicaid) is a federal and state funded health care program providing benefits to low-income persons and a "health care benefit program" under 18 U.S.C. § 24(b). HHS, through CMS, administers Medicaid in conjunction with the states. Like Medicare Managed Care plans, Medicaid Managed Care plans can be administered by private entities, in Rhode Island and elsewhere. Medicaid paid for items and services only if they were medically reasonable and necessary, eligible for reimbursement, and provided as represented.

### CHAMPVA

21.     The Civilian Health and Medical Program of the Department of Veterans Affairs (CHAMPVA) was a federal health care benefit program within the United States Department of Veterans Affairs (VA) through which the VA shared the cost of covered health care services and supplies with eligible beneficiaries. The eligible categories for CHAMPVA beneficiaries were the spouses or children of veterans who had been rated permanently and totally disabled for a

6

service-connected disability and the surviving spouse or child of a veteran who died from a VA-rated service-connected disability. In general, CHAMPVA covered most health care services and supplies that were medically and psychologically necessary.

### TRICARE

22.     TRICARE was a federal health insurance program of the United States Department of Defense (DoD) Military Health System that provided coverage for DOD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and their survivors. The Defense Health Agency (DHA), an agency of the DOD, was the governmental entity responsible for overseeing and administering the TRICARE program. TRICARE offered health insurance benefits for medically necessary DME and prescriptions that were prescribed by a licensed medical professional.

### Federal Employees Compensation Act

23.     The Federal Employees Compensation Act (FECA) provided monetary compensation, medical services and supplies, and vocational rehabilitation to United States government civilian employees who sustained on-the-job injuries or employment-related occupational illnesses. The U.S. Department of Labor, Office of Workers Compensation Programs (OWCP) administered FECA.

24.     Health care providers who enroll to treat federal civilian employees covered by OWCP must complete Form OWCP 1168 and certify that the provider had satisfied all applicable federal and state licensing and regulatory requirements. Moreover, when providers submit claims to and accept payment from OWCP, they certify that the service for which reimbursement was sought and received was provided as described and was medically necessary, appropriate, and properly billed in accordance with accepted health care industry standards.

25.     A company such as Zynex that provided DME to a FECA claimant was only entitled to be reimbursed for prescription-only equipment, if, among other things, it was dispensed pursuant to a prescription from an authorized prescriber who deemed the equipment medically necessary and appropriate.

**Private Insurance Providers, Including Workers' Compensation and Auto Insurance**

26.     Private insurers are non-government run insurance programs, some of which are often employer-sponsored programs. These insurance plans are funded by premiums paid by an individual's employer and the employee and can vary widely in terms of the plan type, coverage and cost. Many private insurers also administer government-sponsored plans, such as Medicare Advantage plans and Medicaid Managed Care programs, in addition to offering private, i.e. non-federally funded, plans. Private insurance companies also cover DME through auto-insurance and workers-compensation insurance programs.

27.     Medicare, including Medicare Advantage plans, Medicaid, TRICARE, CHAMPVA, FECA and private health insurers were "health care benefit programs," as defined in 18 U.S.C. § 24(b).

28.     All of the health care benefit and insurance programs (together "Payors') require, among other things, that the provision of medical devices be medically necessary in order to be billable to the insurer.

**Requirements to Bill DME to Health Care Payors**

29.     DME companies and other health care providers (collectively, "providers") that provided items or services to health care beneficiaries were able to obtain unique identifiers known as National Provider Identifier (NPI) numbers from CMS. Once a provider is assigned an

NPI number, a provider is able to submit claims to public and private insurers for payment. Without an NPI number, payment for claims are typically denied by insurers

30.     The term "ordering/referring" means the physician or nurse practitioner or other authorized prescriber who ordered, referred or certified an item or service in a health care claim. Individuals who ordered, referred, or certified these items or services were required to have the appropriate training, qualifications, and licenses.

31.     Under Medicare Part B, DME was required to be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury, ordered by a medical professional, properly documented, and provided as represented to Medicare. The other Payors had similar requirements or followed the CMS guidance and Medicare rules.

32.     In or about August 2, 2011, CMS Manual Publication 100-08 Medicare Program Integrity provided additional instructions for billing DME supplies that are provided on a recurring basis. These instructions specifically prohibited auto-shipping without confirming for each refill that the patient actually needed the supplies. They stated:

> 5.2.6- …For DMEPOS [Durable Medical Equipment, Prosthetics, Orthotics and Supplies] products that are supplied as refills to the original order, **supplier must contact the beneficiary prior to dispensing the refill and not automatically ship on a pre-determined basis, even if authorized by the beneficiary.** This shall be done to ensure that the refilled item remains reasonable and necessary, existing supplies are approaching exhaustion, and to confirm any changes/modifications to the order.   [Emphasis added]

https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R378PI.pdf

33.     This language that prohibits auto-shipping without confirming that the refill supplies are actually needed by the patient is reiterated in LCD L33802, which was effective for services performed on or after October 1, 2015.

9

## How Providers Bill Medicare and Other Payors

34.    In order to bill health care benefit programs such as Medicare, Medicare Advantage, other government health care payors and private insurers, providers use a five-digit Current Procedural Terminology (CPT) code, that identifies the nature and complexity of the service provided. The CPT codes are listed in the CPT manual, which is published annually by the American Medical Association (AMA). CPT codes are universally used by health care providers to bill government and private health insurance programs for services rendered. Similarly, Healthcare Common Procedure Coding System (HCPCS) codes are standard codes that represent medical procedures, supplies, products and services and are represented by a letter followed by four numeric digits. Virtually every medical procedure has its own CPT or HCPCS code and insurance companies pay a specified amount of money for each code billed.

35.    In order to submit a claim for payment to a health insurance program, providers must obtain the patient's consent to access and use their confidential health care information and identity information such as their name, health care insurance identifier number, and date of birth.

## Billing Codes Used by Zynex in Connection with the NexWave

36.    There are several codes that Zynex commonly billed in connection for the NexWave and other electrotherapy device and associated supplies. The codes most often used for the NexWave device and supplies are as follows:

Devices:
E0730: Transcutaneous electrical nerve stimulations (TENS) device with four or more leads.
E0745: Neuromuscular stimulator (NMES), electronic shock unit
E1399: Miscellaneous durable medical equipment

Supplies
A4595: Supplies for TENS device. This is an all-inclusive, or bundled, code for electrodes, conductive paste or gel, tape, and batteries.
A4556: Electrodes (e.g. apnea monitor), per pair

A4630: Replacement batteries for a medically necessary TENS unit owned by a patient

A4557: Lead wires for two electrodes

### Requirement to Use Bundled Codes for Supplies When Applicable

37.    In October 2015, CMS provided guidance about the billing of supplies for TENS units in Article ID A52520 that prohibited using separate, unbundled codes such as A4556 (electrodes) and A4630 (batteries), to bill supplies for TENS. https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleId=52520. The Guidance stated:

> During the rental of a TENS unit, supplies for the unit are included in the rental allowance; there is no additional allowance for items such as electrodes, lead wires and batteries. If a TENS unit (E0720 or E0730) is purchased, the allowance is all-inclusive of items such as lead wires and one month's supply of items such as electrodes, conductive paste or gel (if needed), and batteries.

This same policy further states:

> A TENS supply allowance (A4595), is an all-inclusive code and includes items such as electrodes (any type) conductive paste or gel (if needed, depending on the type of electrode), tape or other adhesive (if needed, depending on the type of electrode), adhesive remover, skin preparation materials, batteries (9 volt or AA, single use or rechargeable), and a battery charger (if rechargeable batteries are used).

> **Codes A4556 (Electrodes, [e.g., apnea monitor], per pair), A4558 (Conductive paste or gel), and A4630 (Replacement batteries, medically necessary TENS owned by patient) are not valid for claim submission to the DME MAC. A4595 should be used instead. ...**

> There should be no billing and there will be no separate allowance for replacement electrodes (A4556), conductive paste or gel (A4558), replacement batteries (A4630), or a battery charger used with a TENS unit.

### COUNT ONE
### (Conspiracy to Commit Mail Fraud, Heath Care Fraud and Securities Fraud
### 18 U.S.C. §§ 1341, 1347, 1348, 1349)

38.    The preceding paragraphs are re-alleged and incorporated herein by reference.

11

39.    From in or about at least 2017 and late 2025, in the District of Rhode Island and elsewhere, the DEFENDANTS,

**(1) THOMAS SANDGAARD,** and

**(2) ANNA LUCSOK,**

together with others known and unknown to the Grand Jury, did knowingly and willfully, that is with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree to commit offenses against the United States, that is:

a.    to knowingly, and with the intent to defraud, devise, and intend to devise, a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice to defraud, knowingly placed and caused to be placed in any post office and authorized depository for mail a matter and thing, to wit, packages of medical devices and supplies for those devices, to be sent and delivered by the United States Postal Service, and deposited and caused to be deposited a matter and thing, to wit, medical devices and supplies for those devices, to be sent and delivered by a private and commercial interstate carrier, in violation of Title 18, United States Code, Section 1341 (Mail Fraud).

b.    to knowingly and willfully execute a scheme and artifice to defraud health care benefit programs affecting interstate commerce, as defined in Title 18, United States Code, Section 24(b), that is Medicare, CHAMPVA, and TRICARE ("Federal Health Care Plans"), Medicaid, the Federal Employees Compensation Act (FECA) and other federally paid health insurers and commercial insurers for DME that were (1) medically unnecessary and/or (2) not properly billed to the insurer despite being repeatedly instructed on the policy and existing billing guidance; and/or (3) unbundled from the proper CPT/HCPCS code in order to maximize reimbursement; (contained false and misleading statements, including diagnosis codes that misrepresented the basis for the claim or were not eligible for reimbursement) and (4) to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, including the NexWave and other electrotherapy units and related supplies such as electrodes, batteries and lead wires, in violation of Title 18; United States Code, Section 1347 (Health Care Fraud); and;

c.    to knowingly execute and attempt to execute, a scheme and artifice (i) to defraud in connection with any security of an issuer with a class of securities

registered under section 12 of the Securities and Exchange Act of 1934 ("a Security"), to wit, Zynex, or that is required to file reports under section 15(d) of the Securities and Exchange Act of 1934 and (ii) to obtain, by means of false and fraudulent pretenses, representations and promises, any money or property in connection with the purchase and sale of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, to wit, Zynex, in violation of Title 18 United States Code, Section 1348 (Securities Fraud).

## The Object of the Conspiracy

40.     It was the object of the conspiracy for the DEFENDANTS to unlawfully enrich themselves by obtaining money and other things of value by submitting and causing the submission of false and fraudulent claims to Payors and patients and making false and misleading representations to investors and potential investors.

## Manner and Means of the Conspiracy

41.     The manner and means by which the DEFENDANTS and their co-conspirators known and unknown to the Grand Jury sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

42.     It was part of the conspiracy that from in or about 2017 through late 2025, SANDGAARD and LUCSOK and others orchestrated and carried out a scheme to defraud by submitting fraudulent billings to government and private health care payors and patients and using the billings and revenues from that fraud to inflate Zynex's financial reporting and defraud its investors into believing that the company was more profitable and law-abiding than it was.

### Knowingly Billing Unnecessary and Excessive Amounts of Supplies

43.     It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to submit false and fraudulent claims to Payors and patients by automatically shipping and billing supplies each month, unrelated to the amount of supplies the patients were using or needed, and without a prior determination of any medical need for refills of the supplies, even

13

though they knew it was contrary to the CMS 2011 Guidance, described above, which requires confirmation of patient need each time prior to shipping monthly supply refills, and even though Zynex, with the approval of SANDGAARD, had represented to the Department of Justice, among others, in or about 2015, that it followed this CMS Guidance and had no automated shipment or billing process, that refill supplies were only shipped if patients requested the refill supplies, and that if a patient could not be contacted, no supplies were shipped.

44.     It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to fraudulently bill, on a monthly and/or recurring basis, many multiples of CPT codes A4556 (electrodes), A4557 (lead wires) and A4630 (batteries) rather than the bundled codes A4595, which covers, among other things electrodes and batteries, despite explicit CMS guidance noted above that provides that only A4595 should be billed, and specifically providing that A4556 (electrodes unbundled) and A4630 (batteries unbundled) should not be billed with this type of electrostimulation device.

45.     It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to ship and bill the unbundled codes in volumes as large as 32, 64, or 128 electrode pairs to individual patients per month, sometimes charging up to or more than $1,700 per month for these supplies (which are available on the internet for a fraction of this cost).

46.     It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to ship excessive supplies to patients and submit fraudulent billings for those supplies even when numerous patients communicated to Zynex that they had too many supplies and wanted them to stop sending them more supplies and stop billing for those supplies.

47.     It was further part of the conspiracy that SANDGAARD and LUCSOK continued the practice of automatically shipping and billing monthly supplies without medical need even

14

after many patients complained about the excessive supplies, surprise billing, and the difficulty

of getting Zynex to stop shipping them, and complained both directly to Zynex, and to

organizations such as the Better Business Bureau, including, the following two examples:

    a.  1/11/2022: [T]hey kept mailing me supplies and I kept getting denials. I called today and was informed that I owe a tremendous amount of money. I also was told that they do not bill Medicare. I live on $1100.00 dollars a month and can not [sic] afford much period. I told them I could send back most of the supplies and the machine back. She informed me that there still would be a rental fee and supply fees. I told her that I could not even afford food at this point.

    b.  1/24/2023: I was very very clear with [the Physical Therapist] that I could not afford any out of pocket expense and he was very very clear that this was completely covered by insurance. I received the product and then continued to received [sic] batteries and electrodes. AFTER NINE MONTHS I received a bill with 27 charges for supplies. This was the first bill I ever received, they just kept racking up the charges and they waited nine months to send the bill. The minute I received it, I called the company and they were unable to connect me with the billing department, we set-up a call back – still waiting. I feel like this company is a total SCAM.

48.    It was further part of the conspiracy that SANDGAARD and LUCSOK continued

the practice of automatically shipping and billing monthly supplies without medical need despite

the fact that many of its own employees raised concerns that these and other Zynex practices

were improper, unethical, fraudulent and contrary to Payors' requirements.

49.    It was further part of the conspiracy that far from listening to these concerns

raised by their own employees and stopping the fraudulent "oversupply" scheme,

SANDGAARD and LUCSOK labelled employees who raised such concerns as "non-aligned" or

"toxic" and often caused them to leave the company and also mandated that Zynex not hire

billing employees with prior experience in coding.

50.    It was further part of the conspiracy that SANDGAARD and LUCSOK caused

Zynex to continue to automatically ship and bill supplies for the NexWave and other

electrotherapy devices without any demonstration of medical necessity, when they knew these practices violated CMS guidance as well as Payors' policies and directions, and despite receiving numerous communications from Payors stating that the practice of auto-shipping was not allowed, including, as early as 2017, the direction from Payor P: "Auto Shipping of monthly supplies is not allowed."

51.    It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to continue to automatically ship and bill excessive quantities of supplies for the NexWave and other electrotherapy devices on a monthly basis, without determining whether the patients had a need for those supplies, despite the fact that, for example, on or about April 3, 2023, Payor H, in a letter forwarded to LUCSOK, put Zynex on pre-payment review, for, among other things, billing services/supplies that had not been requested. It stated:

> [Y]ou are not following [Payor H's] guidelines which **requires the provider to ensure the patients actually need the supplies before sending them. [Payor H] does NOT support or endorse auto-shipping**. This is stated in our April 5, 2023 letter. Plus, you were educated on this in November 8, 2019. We have contacted multiple patients who stated they get supplies each month without Zynex contacting them. Plus, the patients have shared they do not need any more supplies and have contacted Zynex to stop sending them, but Zynex keeps sending. [Emphasis added]

52.    It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to continue to bill Payors using unbundled codes, including A4556, despite repeated notice that this practice was impermissible and illegal, including on or about March 24, 2020, Payor L wrote to SANDGAARD that Zynex could not bill code A4556 and should only use A4595, the bundled code, for supplies. The letter also noted that Payor L's review revealed Zynex was "submitting claims for TENS electrodes using CPT code A4556." The letter directed SANDGAARD to Payor L's Professional Provider Office Manual, which points out that code A4556 is not separately allowed for reimbursement. Later the same day, SANDGAARD

responded to Payor L copying LUCSOK "Thank you very much for letting us know. We will ensure that our billing department adhere to the [Payor L] guidelines at all times."

53.     It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to continue to bill Payors using unbundled codes, including A4556, despite the fact that they received notice from Payor H repeatedly that this was not permitted, including in repeated letters and email messages between in or about April 2023 and March 2024, in which Payor H wrote, among other things, "The use of code A4556 is improper." Payor H also wrote: "Specific to the billing of Code A4556, we continue to see claims using this procedure code as recent as a claim for 01/03/2024. If you are acknowledging this code is being used incorrectly, then you also need to cease billing for it."

54.     It was further part of the conspiracy that, despite the fact that, on or about March 29, 2024, Zynex acknowledged to Payor H that "codes A4556 (unbundled code for electrodes) and A4630 (unbundled code for batteries) were billed incorrectly," SANDGAARD and LUCSOK caused Zynex to continue to bill improperly using A4556 and A4630 for unbundled supplies through at least the fall of 2025.

55.     It was further part of the conspiracy that SANDGAARD and LUCSOK continued these practices even after, beginning in about late 2022, and continuing through 2023, Zynex received notice from a group of financial reporters who published a series of articles in a subscription newsletter about Zynex's fraudulent billing practices and the risk to its stock as a result. These articles included reports of complaints from patients about excessive supplies and other improper billing practices, and corroborative statements from Zynex employees. The December 2022 article stated:

Moreover, complaints made to the FTC by both Zynex customers and employees and obtained by The Capitol Forum through an additional public records request indicate that the company is deceiving patients and shipping far more supplies than necessary. 'Normal electrode usage for TENS is approximately 2-4 pairs per month, the number covered by Medicare and most commercial insurers such as Aetna," a complaint to the FTC reads, "I have personally received over 640 pairs of electrodes from Zynex for a single prescription. Based on Medicare's average coverage of 3-pairs per month, Zynex sent me over 20x the usual amount, enough for 18 years of constant use."

56.     It was further part of the conspiracy that SANDGAARD and LUCSOK continued these practices after one article published by Capitol Forum, on or about May 9, 2023, described a beneficiary "receiving hundreds and hundreds of unnecessary electrodes from Zynex and sent us pictures of her stash of electrodes." The article alleged: "Zynex is sending more electrodes than are medically necessary and this appears to mirror a False Claims Act case [against a similar company] from 2018."

57.     It was further part of the conspiracy that, instead of addressing the concerns raised by these reporters, SANDGAARD hired someone to attempt to disrupt the lives of the reporters with the intent of retaliating against them and deterring them from further alerting the markets to these issues. These efforts included having someone sign the reporters up for therapy sessions without their knowledge or permission and listing their issues as including erectile disfunction. They also included sending used female underwear to one reporter's spouse at the reporter's home and sending the spouse a thank you card detailing the reporter's alleged "illicit behavior" – all apparently with the intent to convince the spouse that her husband was being unfaithful.

58.     It was further part of the conspiracy that SANDGAARD and LUCSOK continued the auto-shipping even after, in or about June 4, 2024, the medical journal STAT published an article about Zynex entitled "How a device maker inundated pain patients with unwanted batteries and surprise bills" and described in great detail the oversupply scheme whereby Zynex

18

sent excessive monthly supplies, such as electrode pads and batteries, to generate higher billings to insurers. It described a sample patient who was "drowning in batteries she doesn't need" and was billed by Zynex for almost $1,000 after Zynex had falsely assured her that the costs would be covered by her insurance. The article also stated that multiple other patients interviewed reported similar situations and that there were dozens of similar complaints in online forums. The reporter also noted that former employees confirmed the scheme's systemic nature.

59.    It was further part of the conspiracy that when the STAT reporter asked SANDGAARD and LUCSOK, among others at Zynex, for comments prior to publishing the article, and asked "[w]hy do you automatically send batteries and electrode pads? Do you check in with patients to ask if they need them?" rather than respond to the questions, LUCSOK arranged for the email to be deleted from email boxes seen by others at Zynex.

60.    It was further part of the conspiracy that SANDGAARD and LUCSOK, throughout this time-period, continued to implement policies and projects at Zynex to implement or augment auto-shipping of large amounts of supplies to patients and auto-billing without first conferring with patient to determine if the supplies were needed, including special projects to try to increase gross billings (which were used to calculate the percentage of revenue recognized) just before the end of a quarter or year, in order to meet revenue targets forecasted for Zynex.

61.    It was further part of the conspiracy that SANDGAARD and LUCSOK, for example, caused a message to be sent to the Zynex billing team, on or about August 6, 2021, that stated "Going forward if a patient is not set up on supplies, and there is no note that they discontinued supplies, we need to set them up on supplies. We will no longer be sending a note to patient support asking them to reach out to the patient to confirm or ask if the patient would like to be set up on supplies."

19

62.    It was further part of the conspiracy that on or about September 19, 2021, SANDGAARD asked LUCSOK "what we are doing to ensure we are exceeding $92M [in billings] in September?" and LUCSOK responded, among other efforts, "We're having the team look for accounts … where supplies can be increased … this will … increase the amount of gross billings going on in September." As indicated by LUCSOK, this increase in supply billings was driven not by increased patient need, but by the gross billing and revenue goals for the quarter.

63.    It was further part of the conspiracy that SANDGAARD and LUCSOK, on or about July 19, 2023, caused Zynex to implement a special project to restart supplies for 486 patients, without determining if they needed the supplies, in order to "generate another $300k in Gross Billings for this month and next." The directions provided that some patients will not be notified at all that their supplies are restarting, and some will simply be told that their scheduled supply shipment was missed and they have shipped it." None of the patients were to be contacted to find out if they actually needed the supplies.

64.    It was further part of the conspiracy that, instead of stopping the use of A4556, on or about January 8, 2024, SANDGAARD and LUCSOK, in order to meet gross billing and revenue targets to report to the public, caused Zynex billing staff to engage in a special project to add larger quantities of electrodes to a list of patients and bill them under A4556.

### Other Fraudulent Billing Practices

65.    It was further part of the conspiracy that DEFENDANTS caused Zynex to bill Payors and patients for the NexWave and other electrotherapy devices and associated supplies using a variety of other fraudulent billing practices, including those described below.

20

### Misrepresenting Diagnosis Codes

66.     It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to bill Payors and patients using codes for diagnoses that they knew were not eligible for reimbursement.

67.     It was further part of the conspiracy that, for example, after in or about March 2020, when TRICARE determined that it would not reimburse any TENS unit for use to treat low back pain, SANDGAARD and LUCSOK caused Zynex employees to misrepresent the diagnosis codes to TRICARE and other Payors by removing codes from billings to avoid mention of the diagnosis of low back pain and instead bill for some other covered condition that their billers could find in the patient records – without regard to whether the prescriber had identified it as the basis for the prescribing of the NexWave and associated supplies.

68.     It was further part of the conspiracy that, on or about January 22, 2021, LUCSOK wrote to SANDGAARD, noting that Payor U appeared to be denying claims for low back pain (similar to TRICARE). "I'll have the team rebill all claims without the [low back pain] code and see if they reprocess" and SANDGAARD responded: "Makes sense," thereby agreeing that upon denial of claims submitted with the diagnosis code actually used in the physician's order, Zynex would remove that code and rebill the claims, without conferring with the prescriber as to whether the altered coding was justified.

69.     It was further part of the conspiracy that SANDGAARD and LUCSOK continued to direct Zynex employees to substitute other diagnoses for the non-covered diagnoses selected by the prescribers even, after, in or about December 2022, TRICARE wrote to Zynex to recoup funds, asserting that Zynex had billed for "services that were not rendered and/or reimbursable" and identifying cases where Zynex billed a code other than M54.5 (low back pain), but the

21

medical record only supported M54.5, which was not a covered diagnosis. This notice stated that Zynex had engaged in "Misrepresentation of diagnosis" in billing for services that were actually for low back pain but listed another code and that such a breach of the participation agreement is "a fraudulent act."

### Misrepresenting Multi-Modal Nature of NexWave Device

70.    It was further part of the conspiracy that SANDGAARD and LUCSOK hid and caused others to hide the multi-modal nature of the device after, or about March 9, 2020, Payor C, notified Zynex of an overpayment of approximately $1.6 million following an audit and thereafter objected to the billing of the NexWave due to, among other issues, its unproven combination of multi-modality functions *i.e.* TENS (Transcutaneous Electrical Nerve Stimulation), NMES (Neuromuscular Electrical Stimulation) and IFC (Interferential Current).

71.    It was further part of the conspiracy that in or about November 2020, after Payor C had advised LUCSOK that it would not reimburse for the unproven multi-modal device, LUCSOK directed Zynex employees to create altered and blurred invoices to hide the fact that the NexWave was a multi-modal device, and then directed Zynex billing employees to use the new blurred invoice to bill all commercial insurers.

72.    It was further part of the conspiracy that SANDGAARD and LUCSOK thereafter caused Zynex to bill the NexWave to Payor C and all other commercial payors with the altered and blurred invoices set forth below as Figure 1 showing only one mode – even though they were actually marketing and shipping the NexWave as a multi-modal device.

Figure 1



At that time, the unaltered marketing materials for the NexWave shows it with the three

modalities clearly visible on the blue buttons as shown in Figure 2 below:

Figure 2



73.     It was further part of the conspiracy that, in or about February 2021, LUCSOK falsely reported to Payor C that ZYNEX would provide Payor C patients with a "signle [sic] modality devices" but in fact continued to supply and bill the NexWave with the altered invoice to disguise the three modalities.

74.     It was further part of the conspiracy that SANDGAARD and LUCSOK billed and caused Zynex to bill various health care Payors and patients contrary to correct coding principles, the requirements of the Payors and the agreements of the patients, including manipulation of when a device was billed as a rental or for purchase, and changing the dates of service to avoid restrictions on payment for items billed on the same date together, caused the submission of fraudulent claims to Payors and patients.

**Waiving Co-Pays, Misrepresenting Pricing and Surprise Billings**

75.     It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex employees to not tell potential patients about the full costs of the device and supplies for which they could be charged in order to induce them to agree to accept the device and monthly supplies, and often delayed billing patients for many months or more than a year and then sent them later bills for amounts the patients did not realize would be charged.

76.     It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to report to Payors that the price of the NexWave and other electrotherapy devices was between $995 and $2995 but directed Zynex staff (1) to tell patients that if their insurance did not cover the device, they would not be charged more than $250 for the device, and (2) not to tell the insurers about the patient's out of pocket price.

77.     It was further part of the conspiracy that SANDGAARD and LUCSOK continued these practices even after, on or about March 9, 2020, Payor C notified Zynex of an overpayment

of approximately $1.6 million following an audit and identified as one of the bases for the overpayment claim the fact that Zynex was routinely and improperly waiving cost-sharing fees. The letter specifically noted that such routine waiving of the patient's share could be fraudulent, with citations to relevant case law.

78.    It was further part of the conspiracy that, on or about March 15, 2020, LUCSOK texted a Zynex sales manager and commented that Payor C "is asking for $1.6 M back because they're claiming we've engaged in fraudulent activity for waiving patient's deductible and coinsurance. I feel like I'm going to throw up." When the sales manager replied, "Oh shit!! Aren't we allowed to settle with the patient?" LUCSOK further commented:

> It's a grey area but I bet the charges they're questioning are from 2017 when we were billing an insane amount and then calling the patient telling them we'd waive deductible if they stay on supplies. We're allowed to have a "financial need policy" meaning if the patient can't afford it, we can settle. This will be difficult to fight depending on what information they have.

When the sales manager responded, "Oh my!! And your job gets harder 😣" LUCSOK replied: "I feel sick like not coronavirus sick but I'm going to throw up sick." On or about March 16, 2020, LUCSOK forwarded the Payor C refund request to SANDGAARD to discuss.

79.    It was further part of the conspiracy that even after the notice from Payor C, SANDGAARD and LUCSOK caused Zynex employees to continue to regularly waive patient cost sharing obligations without notifying the insurers that Zynex was not complying with the requirements of their policies, all in order to induce patients to accept Zynex's products and reduce the likelihood of patients complaining about Zynex's billings, and thus allow Zynex to continue its excessive and fraudulent billing to the insurers.

80.    It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to continue these fraudulent and improper practices even after, in or about January 2025,

Zynex was recognized as a top ten "winner" for the "egregious U.S. healthcare profiteering on account of its "[s]hady billing practices" on the ground that "Patients received Zynex devices understanding the expense would be covered by insurance" but then "got unsolicited supplies of items like batteries and electrodes delivered to them (often excessive quantities), for which they were charged." The article reporting on the award included the following quote:

> 'This is just classic over-billing. It's fraud,' [PK], a senior director at the research group US Pirg and judge on the panel, said. 'The patients feel that they owe the money because they already received the supplies. We see a lot of this kind of abuse within the pain management field.' https://www.theguardian.com/us-news/2025/jan/07/annual-awards-healthcare-profiteering

**Marketing NexWave with Unproven and Misleading Claims**

81.     It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to market the NexWave and other electrotherapy devices with misleading and unproven claims such as it could reduce oral pain medication use by 50%, and that its Interferential Mode was 40X Stronger than TENS and could provide "Pain Relief Can Last for Hours" with "No Side Effects." These promotions often included the image below in Figure 3, which was provided by Zynex with a March 28, 2024, email copied to LUCSOK:

Figure 3



82.     It was further part of the conspiracy that SANDGAARD and LUCSOK continued to direct Zynex employees to market the NexWave and other electrotherapy devices this way, even though they knew that Zynex had no valid studies of these devices for these claims and no such claims were cleared or approved by the FDA.

83.     It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to market its electrotherapy devices by claiming that it was an alternative to opioids and to reduce oral pain medication use even after, on or about March 4, 2021, the FDA sent Zynex a letter, that was shared with SANDGAARD and LUCSOK, which stated that it had come to the FDA's attention that Zynex, including on its website, was "marketing NexWave in a manner that appeared to violate the Food, Drug & Cosmetic Act, 21 U.S.C. § 301 et seq. (the "FDCA"), including by making the following claims:

> NexWave reduces or eliminates opioid use,
> IFC is like an extended relief opioid;
> opioid side effects - respiratory depression, opioid induced constipation ...;
> can reduce or eliminate opioid use,
> penetrates deeper to release endorphins,
> none of the side effects associated with opioids or OTC medications.

The letter requested that all uncleared marketing claims be removed immediately from Zynex's website and all marketing materials.

84.     It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to continue to market the NexWave by claiming that it was an alternative to opioids and could reduce oral pain medication use, even after a Zynex quality manager advised them that Zynex did not have data to support the comparisons to opioids or claims as to IFC or other claims identified by the FDA. This Zynex quality employee manager further advised: "Based on

27

research online with FDA database, etc. these type claims, warnings have led to warning letters previously with fines associated with the false claims," and stated that Zynex needed the following corrective actions:

> Remove anything related to Opioids from any device related material per the letter and review all other devices as well. … On or around anything with our devices, no claims or discussion of Opioids. ….
>
> [O]pen [a Corrective and Preventative Action] to address all off label issues. …
>
> Remove any and all content from website/marketing material which includes any potential false claims. … Update process to ensure appropriate people review and approve all material which is placed in any marketing format (brochures, social medica, website, etc). Preventive action. Review any other products marketing material to ensure any and all claims made align with the 510k clearance.

85.     It was further part of the conspiracy that SANDGAARD and LUCSOK continued to cause Zynex to use such fraudulent and unsubstantiated marketing claims despite the fact that, when LUCSOK suggested relying upon studies of electrostimulation units generally (but not based upon Zynex products), the Zynex quality manager further clarified that this was not permitted, as follows:

> [F]rom my experience legal would get involved in something like this.…Those studies are fine data points from a general sense of IFC/Tens and Opioids. **However, we can't make any claims based on those. Only the FDA has the authority to approve claims after they review all data as part of a submission and any data would have to be very specific to our device and any clinical trial data/studies that we would own/have.** In lieu of that we can only make claims related to what was originally approved by the FDA in the 510k [which did not include any claims relating to opioids or strength of IFC].

86.     It was further part of the conspiracy that after LUCSOK shared all of this information and the quality manager's recommendations with SANDGAARD, SANDGAARD dictated that Zynex "will not stop claiming that opioids are addictive and that the NexWave is a good alternative for pain relief."

28

87.     It was further part of the conspiracy that, on or about March 26, 2021, LUCSOK wrote to the FDA and falsely claimed that Zynex had removed "all content from our website and marketing materials referring to the NexWave reducing or eliminating opioid use as per your letter dated March 4, 2021," despite the fact that, at the direction of DEFENDANTS, Zynex continued to market the NexWave as a way to reduce opioid use with other unclear claims through in or about at least late 2025.

### Use of Invalid Prescriptions

88.     It was further part of the conspiracy that SANDGAARD and LUCSOK knowingly caused Zynex to distribute its prescription-only NexWave device without a valid prescription by distributing the devices based upon orders signed by persons not licensed in their states to write prescriptions for such devices, including physical therapists, registered nurses and physical therapist assistants.

89.     It was further part of the conspiracy that through these means and others, SANDGAARD and LUCSOK caused the submission of fraudulent claims to patients and to federal and commercial health care payors that knowingly and falsely represented that there was a valid prescription for the device when in fact no such valid prescription had been written.

### SANDGAARD'S and LUCSOK'S Receipt of Proceeds of these Frauds

90.     It was further part of the conspiracy that through these means and others, SANDGAARD and LUCSOK caused the submission of fraudulent claims to patients and to federal and commercial health care payors and caused the proceeds from Zynex's fraudulent billing to be deposited into its corporate accounts and from those accounts, to SANDGAARD and LUCSOK in the form of salary, bonuses, other purported compensation payments, stock and stock options, as well as in payment for repurchase of stocks.

**False Statements to Conceal Fraud and Invalid Revenues from Investors**

91.    It was further part of the conspiracy that, as set forth in further detail below, SANDGAARD and LUCSOK knowingly and intentionally caused Zynex to make false and fraudulent statements filed with the SEC by:

      a.    making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      b.    engaging in acts, practices, and courses of business that would and did operate as a fraud and deceit in connection with the purchase and sale of a security, that is, the stock of Zynex.

**Concealing Fraudulent Activities and Invalid Revenues**

92.    It was further part of the conspiracy that SANDGAARD and LUCSOK directed the fraudulent activities described above, set unrealistic targets for gross billings and revenue, and ramped up the pressure on the employees at the end of each quarter and year, including to bill improperly and pull forward billings from the next year or quarter, all in order to meet specific unrealistic expectations for revenue and growth that SANDGAARD and Zynex had projected to the markets.

93.    It was further part of the conspiracy that from in or about 2017, and through in or about late 2025, SANDGAARD and LUCSOK caused Zynex to defraud investors and falsely inflate and improperly recognize revenue by reporting revenue that SANDGAARD and LUCSOK and their co-conspirators knew was not valid revenue from proper billings and was the result of fraud and caused ZYNEX to materially misstate the financial statements incorporated into its annual and quarterly financial statements filed with the SEC.

94.    It was further part of the conspiracy that SANDGAARD and LUCSOK knowingly and intentionally made public statements, including in earnings calls, Zynex's

financial reporting and SEC filings, to make it appear that Zynex was earning more valid revenue, was more profitable, and growing at a more accelerated pace than it actually was.

95.    It was further part of the conspiracy that SANDGAARD and LUCSOK caused Zynex to claim to the public that it was an extremely successful medical device company, touting consistent revenue growth and increases in patient orders. For example, in a March 13, 2023, press release, Zynex reported a 21% year-over-year revenue increase to $158.2 million, a 48% increase in orders and seven consecutive years of profitability.

96.    It was further part of the conspiracy that SANDGAARD and LUCSOK were artificially inflating Zynex's stock price by making and causing to be made false and misleading statements about Zynex's financial performance, operational practices and compliance with health care laws and insurance reimbursement requirements. These statements concealed, among other things, a system oversupply scheme whereby Zynex shipped unnecessary and excessive quantities of supplies, as well as other fraudulent billing practices.

97.    It was further part of the conspiracy that from in or about 2017 through 2025, SANDGAARD and LUCSOK caused Zynex to submit to the SEC and publicly file its false quarterly and annual financial reports, including false certifications with each of its quarterly and annual financial reports certifications in which SANDGAARD falsely certified, that he had reviewed this [quarterly or annual report] of Zynex and, among other things:

> a. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.
>
> b. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report. ....

    c.  I have disclosed … to auditors and the audit committee [of the Zynex Board of Directors] … Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

### False Statements to Auditors

98.    It was further part of the conspiracy that, in order to conceal their fraudulent activities and inflate Zynex's purported revenues, SANDGAARD and LUCSOK also repeatedly made and caused to be made, false representations to Zynex's auditors, including in connection with the preparation, examination, and review of Zynex's financial statements, as well as in Zynex financial statements filed with SEC, including Forms 10-Q and 10-K, as well as other SEC filings. These representations included quarterly letters signed by SANDGAARD, among others, in connection with the preparation, examination, and review of Zynex's financial statements and falsely asserted that SANDGAARD was not aware of any fraud or misstatements and that the revenues of the company reflected valid billings. SANDGAARD made these representations to Zynex's external auditors, and LUCSOK confirmed and supported these representations.

99.    It was further part of the conspiracy that in preparation for each quarterly and end of year SEC filing, SANDGAARD falsely represented to Zynex external auditors that he was not aware of any fraud and that the receivables reported in the financial statements were valid billings, including the following, or similar words:

    a.  Receivables recorded in the consolidated financial statements represent valid billings to customers or payers for sales or other charges arising on or before the balance-sheet dates and have been reduced to their estimated net realizable value …

    b.  We are not aware of any events or circumstances which would indicate that post collection rates would not be representative of our future expected collections on outstanding billings. …

   c.  We have no knowledge of any fraud or suspected fraud that affects the entity and involves:
> Management;
> Employees who have significant roles in internal control; or
> Others when the fraud could have a material effect on the financial statements.

   d.  We have no knowledge of any allegations of fraud, or suspected fraud, affecting the entity's financial statements communicated by employees, former employees, analysts, regulators or others, except for the alleged billing issues/refund requests from [Payor U] that were disclosed to you.

   e.  We have disclosed to you all known instances of non-compliance or suspected non-compliance with laws and regulations whose effects should be considered when preparing financial statements.

Moreover, these representation letters, signed by Zynex executives, noted that "materiality limits do not apply to representations that are not directly related to amounts."

### Concealment of Refund Demands and Payment Suspensions

100.    It was further part of the conspiracy that SANDGAARD and LUCSOK concealed from the public and investors, including through false statements to the contrary, that they knew that Zynex had received many communications from Payors asserting that Zynex's billing practices were improper and fraudulent, and that numerous Payors were demanding refunds and /or suspending payments.

101.    It was further part of the conspiracy that, on or about early January 2025, after SANDGAARD and LUCSOK learned that TRICARE has suspended payments to Zynex based upon credible allegations of fraud and its audit of Zynex's billing, SANDGAARD and LUCSOK refused to promptly disclose this material information to the public, despite explicit advice from their own internal expert that this event was likely to be material to investors, and that Zynex needed to disclose it immediately by filing an SEC Form 8-K report, a form required whenever a company has a major event that shareholders should know about.

102.    It was further part of the conspiracy that on or about February 26, 2025, LUCSOK participated in a public interview in which she claimed that Zynex's success was due to their success in navigating reimbursement. In that interview, she stated that Zynex's reimbursement team had been very successful in obtaining coverage for their patients, without disclosing that in fact many Payors had stopped reimbursing Zynex, including TRICARE, which made up approximately 25% of Zynex's revenues, and had temporarily suspended payments as of December 2024.

103.    It was further part of the conspiracy that SANDGAARD and LUCSOK concealed the TRICARE suspension until on or about March 11, 2025, immediately after which Zynex's stock price dropped in one day by approximately 51%, or -$3.59 per share, from $7.00 to $3.41.

104.    It was further part of the conspiracy that, when, on or about March 11, 2025, Zynex disclosed the TRICARE suspension to explain the precipitous decline in its fourth quarter revenues, SANDGAARD and LUCSOK still did not disclose that the suspension was based upon an audit and credible allegations of fraud, but, in the time period between when SANDGAARD and LUCSOK learned of the TRICARE suspension and the March 11, 2025 disclosure of the suspension, a Sandgaard family member sold a significant amount of Zynex stock.

105.    It was further part of the conspiracy that, two days after the first disclosure of the TRICARE suspension, SANDGAARD caused Zynex to repurchase $4.8 million of his stock – even though the company could ill-afford the loss of cash at that time.

106.    It was further part of the conspiracy that on or about April 29, 2025, in the presence of LUCSOK, SANDGAARD stated on an earnings call about first quarter 2025 earnings: "clearly, our stock price is very low right now and likely lower than it's really justified" and claimed that the company had presented strong arguments that "we have clearly

34

followed our current and existing guidelines and policies" in billing TRICARE and that falsely stated that after the 2022 TRICARE audit, "we made all recommended adjustments to billing and reimbursements that they've requested." On the call, LUCSOK also falsely stated that they had provided "strong evidence to dispute [TRICARE'S] statements and questions."

## Overt Acts

107.    It was further part of the conspiracy that SANDGAARD and LUCSOK caused to be shipped by mail to patients across the country, including those in Rhode Island, NexWave and other electrotherapy devices and supplies and caused them to be fraudulently billed to Payors and patients. This includes, as examples, the following mailing and claims for medically unnecessary supplies that DEFENDANTS caused Zynex to automatically mail to the patients in Rhode Island from Colorado.

| Beneficiary | DME Item and Code | Approx. Date | Approx. Amnt. Billed |
|---|---|---|---|
| Patient 2, RI (AG) | TENS Suppl (A4595) | 10/5/2024 | $871.92 |
| Patient 3, RI (CR) | TENS Suppl (A4595) | 11/18/2024 | $871.92 |
| Patient 4, RI (JR) | 64 Electrodes Pairs (A4556) 8 Batteries (A4630) 1 Lead Wires Pair (A4557) | 10/20/2022 | $1,584 (electrodes) $79.92 (batteries) $39.00 (lead wires) $1,702.92 Total |
| Patient 5, RI (JP) | TENS Suppl (A4595) | 2/1/2024 | $217.98 |
| Patient 6, RI (KK) | 64 Electrodes Pairs (A4556) 8 Batteries (A4630) 1 Lead Wires Pair (A4557) | 3/10/2025 | $1,584.00 (electrodes) $79.92 (batteries) $39.00 (lead wires) $1,702.92 Total |
| Patient 7, RI (MB) | 64 Electrodes Pairs (A4556) 8 Batteries (A4630) 1 Lead Wires Pair (A4557) | 1/19/2023 | $1,584.00 (electrodes) $79.92 (batteries) $39.00 (lead wires) $1,702.92 Total |
| Patient 8, RI (NS) | TENS Suppl (A4595) | 3/4/2024 | $217.98 |
| Patient 9, RI (AP) | 20 Electrode Pairs (A4556) 8 Batteries (A4630) | 12/11/2023 | $990.00 (electrodes) $79.92 (batteries) $1,069.92 Total |
| Patient 10, RI (EH) | Electrodes, 20 (A4556) Batteries (A4630) | 3/1/2022 | $990.00 (electrodes) $59.94 (batteries) $1,049.94 Total |

## COUNTS TWO- TEN
### 18 U.S.C. §§ 1347 and 2
### (Health Care Fraud)

108.    The preceding allegations are re-alleged and incorporated herein by reference.

109.    From in or about at least 2017 and the present, in the District of Rhode Island and elsewhere, the DEFENDANTS,

**(1) THOMAS SANDGAARD,** and
**(2) ANNA LUCSOK,**

did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program, as defined in Title18, United States Code, Section 24(b), to wit: Medicare, Medicaid, CHAMPVA, TRICARE, and other Payors and to obtain, by means of one or more materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, those health care benefit programs, in connection with the delivery and payment for health care benefits, items and services, that is the NexWave and other electrotherapy devices and associated supplies, including electrodes and batteries.

### Object of the Scheme and Artifice

110.    The allegations contained in the Object of the Conspiracy section of Count 1 of this Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein as a description of the purpose of the scheme and artifice.

### The Scheme and Artifice

111.    The Manner and Means section of Count 1 of this Indictment is re- alleged and incorporated by reference as though fully set forth herein to describe the scheme and artifice.

36

### Acts in Execution or Attempted Execution of the Scheme and Artifice

112.    On or about the dates specified below as to each count, in the District of Rhode Island, and elsewhere, the DEFENDANTS, together with others known and unknown to the Grand Jury, submitted and caused to be submitted the following false and fraudulent claims to health care benefit programs set forth below, for the individuals whose identities are known to the Grand Jury, in an attempt to execute and in execution of the scheme described above:

| Count | Patient | DME Item | Approx. Date of Claims/ Service | Approx. Amount Billed | Approx. Amount Paid | Payor/ Processor |
|---|---|---|---|---|---|---|
| 2 | Patient 2, RI (AG) | TENS Supplies | 10/5/2024 | $871.92 | $126.90 | BCBS RI |
| 3 | Patient 3, RI (CR) | TENS Supplies | 11/18/2024 | $871.92 | $126.90 | BCBS RI |
| 4 | Patient 4, RI (JR) | 64 Electrodes Pairs 8 Batteries 1 Lead Wires Pair | 10/20/2022 | $1,702.92 | $864.58 | BCBS RI |
| 5 | Patient 5, RI (JP) | TENS Supplies | 2/1/2024 | $217.98 | $24.48 | BCBS RI/ Medicare Advantage |
| 6 | Patient 6, RI (KK) | 64 Electrodes Pairs 8 Batteries 1 Lead Wires Pair | 3/24/2025 | $1,702.92 | $864.58 | BCBS RI |
| 7 | Patient 7, RI (MB) | 64 Electrodes Pairs 8 Batteries 1 Lead Wires Pair | 5/19/2023 | $1,702.92 | $864.58 | BCBS RI |
| 8 | Patient 8, RI (NS) | TENS Supplies | 3/4/2024 | $217.98 | $24.48 | BCBS RI/ Medicare Advantage |
| 9 | Patient 9, RI (AP) | 20 Electrodes Pairs 8 Batteries | 12/11/2023 | $1,069.92 | $264.74 | TRICARE |
| 10 | Patient 10, RI (EH) | 20 Electrodes Pairs 6 Batteries | 3/1/2022 | $1,049.94 | $247.80 | TRICARE |

Each in violation of Title 18, United States Code, Section 1347 and 2.

## COUNTS ELEVEN- TWELVE
### 18 U.S.C. §§ 1341, 2
### (Mail Fraud)

113.    The preceding allegations are re-alleged and incorporated herein by reference.

114.    On or about the dates listed below, in the District of Rhode Island and elsewhere, DEFENDANTS

**(1)  THOMAS SANDGAARD,** and
**(2)  ANNA LUCSOK,**

and others known and unknown to the Grand Jury, knowingly, and devised, intended to devise and participated in a scheme to defraud and obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, including from the patients listed below, and for the purpose of executing the scheme and artifice to defraud, knowingly placed and caused to be placed in any post office and authorized depository for mail a matter and thing, to wit, packages of medical devices and supplies for those devices, to be sent and delivered by the United States Postal Service, and deposited and caused to be deposited a matter and thing, to wit, medical devices and supplies for those devices, to be sent and delivered by a private and commercial interstate carrier, as set forth below:

| COUNT | Approx. Date | Mailing |
|---|---|---|
| 11 | 10/1/2024 | Mailing of TENS Supplies to Patient 5 (JP) from CO to RI |
| 12 | 9/4/2023 | Mailing of TENS Supplies to Patient 8 (NS) from CO to RI |

All in violation of 18 U.S.C. § 1341, and 18 U.S.C. § 2.

## COUNTS THIRTEEN-FIFTEEN
### 18 U.S.C. § 1028A(a)(1) and 2
### Aggravated Identity Theft; Aiding and Abetting

115.    The preceding allegations are re-alleged and incorporated herein by reference.

116.    On dates before the dates listed in the chart below, Patient 5 (JP), Patient 7 (MB) and Patient 9 (AP) contacted Zynex and expressly told Zynex that they did not want further electrotherapy supplies shipped to them. Notwithstanding these patients' express instructions, on numerous occasions thereafter, including on the dates listed in the table for Counts 13-15 below, Zynex used the information of Patients 5, 7 and 9, among others, including their names, date of births and health insurance account number, to ship these patients additional and unwanted and unnecessary medical supplies and to bill the patients' insurance companies for the unwanted and unnecessary medical supplies.

117.    On or about the dates set forth in the table below, in the District of Rhode Island and elsewhere, DEFENDANTS

**(1) THOMAS SANDGAARD,** and
**(2) ANNA LUCSOK,**

did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, to wit the name, date of birth and unique health insurance identification number, among others, of the individuals listed below, during and in relation to a felony violation enumerated in 18 U.S.C. § 1028A(c), that is, mail, health care and securities fraud, and conspiracy to commit those frauds, in violation of 18 U.S.C. §§ 1341, 1347, 1348, and 1349.

39

| Count | Approximate Date | Use of Identity |
|---|---|---|
| 13 | 3/1/2024 | Use of Patient 5 (JP)'s name, date of birth, and health insurance account number, to ship and fraudulently bill for unnecessary medical supplies, contrary to Patient 5's express direction and medical needs |
| 14 | 6/19/2023 | Use of Patient 7 (MB)'s name, date of birth, and health insurance account number, to ship and bill for unnecessary medical supplies contrary to Patient 7's's express direction and medical needs |
| 15 | 5/11/2024 | Use of Patient 9 (AP)'s name, date of birth, and health insurance account number, to ship and bill for unnecessary medical supplies contrary to Patient 9's's express direction and medical needs |

All in violation of Title 18, United States Code, Section 1028A(a)(1) and 2.

## FORFEITURE ALLEGATIONS

118.    The allegations above are realleged and incorporated by reference.

119.    The Grand Jury further charges that: upon conviction of one or more of the

offenses charged in Counts One to Twelve of this Indictment, DEFENDANTS

**(1)  THOMAS SANDGAARD,**
**(2)  ANNA LUCSOK,**

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C),

982(a)(2)(A) and 982(a)(7), and Title 28, United States Code, Section 2461(c), any property, real

or personal, that constitutes, or is derived from, proceeds traceable to the commission of the

offenses.

120.    If any of the property described in paragraph 119 hereof as being forfeitable

pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2)(A) and 982(a)(7), and

Title 28, United States Code, Section 2461(c), as a result of any act or omission of the

DEFENDANTS:

      a.    cannot be located upon the exercise of due diligence;

      b.    has been transferred to, sold to, or deposited with a third party;

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without
          difficulty,

the United States shall be entitled to forfeiture of substitute property under 21 U.S.C. § 853(p) as

incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. 2461(c).    It is further the intention of the

United States to seek a money judgment as necessary to cover all fraud losses.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(2)(A) and

982(a) (7), and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____                    Date: 1/14/2026
Grand Jury Foreperson

_____                    Date: 1/14/2026
SARA MIRON BLOOM
Assistant United States Attorney
First Assistant United States Attorney

_____                    Date: 1/14/2026
PETER ROKLAN
Assistant U.S. Attorney

_____                    Date: 1/14/2026
LEE H. VILKER
Assistant U.S. Attorney
Criminal Division Deputy Chief

42